## BURDON WIRE & SUPPLY CO. v. WILLIAMS.

### UNITED WIRE & SUPPLY CO. v. SAME.

(Circuit Court, D. Massachusetts. March 1, 1904.)

#### Nos. 1,188, 1,589.

1. PATENTS—VALIDITY AND INFRINGEMENT—JEWELERS' PLATED WIRE.

The Burdon patent, No. 381,527, for a process of manufacturing compound ingots for seamless plated wire, for use in the jeweler's art, by placing a base metal core within a seamless shell of gold, leaving an annular space between them into which is forced a tubular sleeve of solder, the whole being then heated until the solder is fused, uniting the core and shell with a uniform thickness of the same, was not anticipated, and is valid. Such patent is infringed by the use of a process which is substantially the same in principle, mode of operation, and the effect produced, the only difference being in the manner in which the three parts of the product are assembled, as by inserting the sleeve of solder into the shell and driving the core in afterward, which is merely a variance in the mode of using the same process, and one which is described as such in the specification of the patent.

2. SAME—ABANDONMENT.

The question whether a patentee has abandoned any part of what he has described in his patent is largely one of intention, and the fact that while the specification of a process patent describes two or three ways of performing one of the steps of the process which are equivalent but one is mentioned in the claims does not constitute an abandonment of those not so mentioned.

3. SAME—UTILITY—EVIDENCE.

Upon the question of the utility of a patented device or process, the fact that it was the first to achieve practical and commercial success is of weight.

4. SAME—INFRINGEMENT—PROCESS.

Infringement of a process patent is not avoided by reversing one of the mechanical steps of the process, where the purpose and result of the step is the same, as by expanding an inner tube, instead of compressing an outer one, for the purpose of bringing the two into close contact.

5. SAME—PROCESS FOR MAKING PLATED WIRE.

The Meyer patent, No. 445,814, for an improvement in the process of the Burdon patent, No. 381,527, for manufacturing ingots for seamless plated wire, construed, and *held* infringed.

In Equity.

Wilmarth H. Thurston, for complainants.
Horatio E. Bellows, for defendant.

HALE, District Judge. This is a bill in equity to restrain the infringement of letters patent No. 381,527, dated April 24, 1888, to Levi L. Burdon, and letters patent No. 445,814, dated February 3, 1891, to George U. Meyer. The original suit was brought by the Burdon Wire & Supply Company, the assignee of the patents in suit. The patents were afterwards assigned to the United Wire & Supply Company, and a supplemental bill was brought by that company asking to be substituted for the Burdon Wire & Supply Com-

¶ 3. Utility, extent of use, and commercial success as evidence of invention, see note to Doig v. Morgan Mach. Co., 59 C. C. A. 620.

pany as complainant in the case. The action of record may be taken in the case of the supplemental bill, as this bill shows the present parties to the controversy. The two patents are alleged in the bill to be capable of conjoint use, the Meyer patent being alleged to be a step supplemental or additional to the method which forms the subject of the Burdon patent.

The court will first direct its attention to the Burdon patent, No. 381,527. The invention in this patent relates to the manufacture of compound ingots for seamless plated wire for use in the jeweler's art. The first duty of the court is to inquire into the state of public knowledge at the time in reference to the art. In the former manufacture of plated wire, a flat sheet of gold was plated upon a flat block of base metal; the ingot so formed was rolled down to a convenient thickness; the flat product thus obtained was cut into strips about an inch wide; each of these plated strips was then drawn up into a tube, bringing the two longitudinal edges together. This plated tube was subsequently drawn down into plated wire. This plated tube necessarily had a longitudinal seam where the two edges came together, and this seam, as the case shows, was necessarily present in the plated wire which was drawn out from the plated tube. To prepare this seamed wire for use in the art, the seam was sometimes soldered up with silver solder, and sometimes was left without solder. The record discloses the objections which appear to the use of this seamed wire, either in its soldered or in its unsoldered form. In either case the seam was unsightly, and injured the appearance of the chains and other articles made from the wire. Devices had to be employed to conceal the seam whenever possible. All wire made in this way was necessarily hollow. The complainant claims that the patentee was the first to produce seamless plated wire having a base metal interior, and an exterior of gold or other precious metal without seam, a wire which for all practical purposes in commerce is claimed to be as good as a solid gold wire, and has had so constant an increase in its use that it has completely supplanted the old seamed wire. This wire is made from the compound ingot manufactured by the process, which forms the subject of the patent. The patent relates only to the formation of a cylindrical ingot by employing a seamless tube or shell of precious metal with a solid cylinder of base metal within the seamless shell, the wire drawn from these ingots being without any longitudinal seam. In making the cylindrical ingot, it was found absolutely necessary that the two parts composing the ingot, namely, the seamless shell and the cylindrical core, should be soldered firmly together. It was found also to be necessary that the shell and core should be united with a thin film of solder extending uniformly throughout the entire adjacent surfaces of the shell and the core. If the film of solder were not uniformly thin, the subsequent reducing and drawing-out process would form blisters, or produce a tearing away of the shell from the core. And so the proper soldering together of the shell and core became an important problem in the art. The complainant claims that the patentee addressed himself to this problem for years; that in his 1884 patent, No. 294,722, he invented the method

of inserting a base metal core within a seamless gold shell, the shell extending beyond the core to form a chamber. In this chamber he placed loose solder, and then subjected the ingot to heat, and so fused the solder and caused it to run down into an annular space between the core and the shell. The complainant claims that the patentee did not by this method obtain a perfectly soldered ingot, for the reason that the solder would not, in running down, distribute itself with uniform thickness throughout the adjacent surfaces of the shell and core. The patentee's next invention is found in his 1885 patent, No. 327,655, in which his method consists in covering the surface of the cylindrical base metal core with solder filings, and fusing it upon the core, then turning this soldered-covered core in a lathe to remove the surplus solder and make a uniform surface, then inserting this solder-covered core within the gold shell, and subjecting the whole to heat, to fuse the solder and unite the shell and core. The complainant says that neither of these methods proved successful in producing an ingot having a core and shell properly united, or in making a seamless plated wire for commercial use. His next invention was embodied in the patent in suit.

In order to find the thought in the mind of the inventor and get the exact scope of his invention, let us examine the specification. He sets out by saying that, in the manufacture of jewelry or other articles in which plated stock is employed, the quality of the goods produced, especially when plated wire is used, depends in a great degree on the care exercised by the workmen in concealing as far as possible the longitudinal seam, which had generally been considered unavoidable in the making of plated wire. He then proceeds:

"The object of my present invention is to produce a soldered compound ingot adapted to be drawn down into seamless wire, the latter being free from 'blisters' and other imperfections as developed in wire produced from ingots as heretofore usually made. To this end I preferably take a core of base metal of suitable dimensions and wrap a thin layer or unbroken sheet of solder around it. I next place the same within and snugly fitting a seamless tube or shell of fine metal, adding at one end of the ingot, if desired, a chamber in which to place loose solder. The whole is then submitted to the action of heat to fuse the solder, thereby producing a compound ingot in which the core and seamless shell are united by an unbroken film of solder, as will be hereinafter set forth and claimed."

In the description of his drawings and of his ways of assembling the three parts, namely, the seamless shell, the sleeve of solder, and the cylindrical core, he says:

"The interior surface of the gold shell is * * covered with borax, and the core then placed centrally therein, thereby forming an annular space between the adjacent surfaces. * * * A shell or tube of solder is then forcibly inserted into the annular space to the lower end of the core, and the whole then subjected to the action of heat exceeding the fusing point of the solder.

"Practically I obtain the best result by vertically suspending the ingot and revolving or twisting it around while in the furnace, thereby uniformly heating its surface. After the ingot is removed from the furnace it is found that the contiguous surfaces of the shell and core are united throughout their length by a uniform thickness or film of solder. Solder loosely placed in the chamber serves to insure the filling of the annular space therewith as the fusing progresses.

128 F.—59

"In lieu of forcing the tube of solder into position, as before described, it may be first inserted within the gold shell, and the core then placed in position therein, and forced some under a light pressure, without departing from the spirit of the invention."

It will thus be seen that his specification describes three ways of assembling the three parts: First, by wrapping the sheet of solder around the core, whereby it is bent into a sleeve surrounding the core, and then inserting the core and the sleeve of solder together into the seamless shell; second, by placing the core centrally within the seamless shell, and then forcibly driving the sleeve of solder into the annular space between the shell and core; third, inserting the sleeve of solder inside the seamless shell, and then inserting the core within the sleeve of solder and driving it in.

The two claims are as follows:

"(1) The improved method herein described of making compound ingots, the same consisting, first, in preparing the surfaces of the base metal core and the seamless gold shell to unite with solder; next, introducing the core within said shell, thereby forming an annular space between them; then inserting a sleeve of solder into said annular space; and, finally, subjecting the whole to a high temperature, which fuses the solder and unites the core and shell with a uniform thickness of the same.

"(2) The improved method of making compound ingots, which consists in inserting a cylindrical base metal core having a slightly reduced diameter within the outer or gold shell, the surfaces thereof having been previously prepared to be united by solder, and having a chamber formed at the upper end; then inserting a thin sleeve of silver or other suitable solder between the core and shell and placing loose solder in said chamber; and, finally, placing the whole within a suitably prepared and heated furnace, thereby fusing the solder and uniting the core and outer shell with a uniform thickness of the same, the ingot, after withdrawal from the furnace, being adapted to be rolled and drawn down to produce seamless filled plated wire."

On examination of the proceedings in the Patent Office relating to the granting of this patent, it will be found that, in addition to the two claims now in the patent prescribing a method of making the ingots, there was a third claim for the product produced from the ingot, namely, for the wire resulting from the new method, describing this wire as a new article of manufacture. The Patent Office required a division of the application between the method and the article claimed, taking the ground that the article did not appear to differ from that shown in prior patents. The applicant accordingly eliminated the third claim of his patent, leaving the two claims now in the patent, striking out the parts of the specification describing the product, and inserting the first paragraph which we have quoted with reference to the object of the invention, a way of assembling the parts, and a description of the chamber, and the fusing process. Thus, by following historically the progress of the patent through the Patent Office, we see the reason why the patentee describes in his claims the method of assembling the parts which he has mentioned second in his specification, namely, that, when he drew the claim, this method of assembling the parts, by introducing the core within the shell, thereby forming an annular space between them, and then inserting a sleeve of solder into the annular space, was the first method which he had mentioned in his specification—the method

which now appears first found its way into the patent in its progress through the Patent Office, as we have above described.

The defenses set up are that the patent is invalid, and that it is not infringed. The defendant cites as anticipatory an old English patent to Richard & Radisson of 1864. The material part of this patent is as follows:

"We cast silver or gold into an ingot, which we pierce through the center of its length with a hole, into which we run rose or refined copper or other suitable metal. Afterwards, when the solidification is complete, this compound ingot is rolled or drawn down until it is reduced to the dimensions required for the wire to be produced, the wire being subjected to the annealing and other operations of wire drawing. The copper in the interior of the ingot is drawn down, together with the exterior metal, the two metals forming but one and the same body. The interior metal may be introduced into the ingot in any other suitable manner, as, for example, by electrotype processes, or by introducing mechanically, or by the aid of solder, a metallic core into the ingot, or by casing silver or gold around an interior core. We do not limit ourselves to the use of copper for forming the core of the ingot, as other metals may be employed for this purpose."

It will be seen that the only reference to solder is in the phrase "or by the aid of solder," referring to the method of putting the base metal core into the ingot. This cannot be held to be anticipatory of the method patent which provides for the cylindrical tube, the base metal core, and the sleeve of solder, and the adjusting or assembling them together. This reference to the use of solder is too general and indefinite to infringe the patent in suit if it had come after, and, coming before, it cannot be held to have anticipated it. The patent at bar is a process patent. This old English patent cannot be held to disclose or even to suggest its process. In speaking of vague prophesies in certain English patents, Judge Shipman, in Westinghouse Air-Brake Co. v. Railway Co., 88 Fed. 263, 31 C. C. A. 529, says:

"The prophetical suggestions in any patent of what can be done when no one has ever decided by actual and hard experience and under the stress of competition the truth of these suggestions, or the practical difficulties in the way of their accomplishment, or even whether the suggestions are feasible, do not carry conviction of the truth of these frequent and vague statements."

The defendant further says, in citing the prior art, that Palmer & Capron were the first in the United States to make seamless gold-plated ingots; that they used the product in finger rings, and made merchantable goods, as early as 1878. When we examine their method, we find that it related only to making finger rings, and did not relate to the making of compound ingots for the manufacture of seamless plated wire. It cannot be found that solder was employed in any way in the process marked out by these patents. The Kaufmann patent is cited and relied upon by the defendant. Kaufmann, by his patent of 1882, describes a method of making seamless drawn or rolled plated wire by forming a disk-shaped blank of composition stock and gold plate or gold alone, drawing the same into the shape of a hollow cylinder with inferior metal, and finally drawing or rolling the cylindrical blank into the proper shape and thickness. He does not disclose any method of uniting the shell and

core together by solder or by any other means. He cannot be held to have anticipated the method of Burdon in the patent in suit.

We have already alluded to the Burdon 1884 patent and the Burdon 1885 patent. The characteristic feature of the 1884 patent was that the solder was placed in the chamber at the upper end of the ingot, with the intention that, when the ingot was fused, the loose solder in melting would flow down into the annular space between the shell and core, and would thus properly unite the parts. But it was found that under this method the solder did not flow down uniformly. It is ingeniously urged by the defense that a sleeve of solder is thus formed simultaneously with the fusing process, and that thus the three elements are combined as in the patent in suit. We do not think that this fusing of the loose solder into a sleeve can be held to take the place of the unbroken sheet of solder which forms one of the three essential parts of the invention of the patent in suit. In this 1884 patent there never existed the uniform, unbroken sleeve of solder which forms an essential part of the Burdon patent in suit. Nor does the 1885 patent show the sleeve of solder in any form. It is claimed by the complainant that it was by reason of the inadequacy of these patents of 1884 and 1885 to effect the desired result that the patentee was led to invent the process disclosed in the patent in suit; and the testimony upon this point is forcible and persuasive. It is urged by the defendant that the art of flat plating as shown in the Kaufmann patent and in other patents contains all the necessary elements of cylindrical plating, and may be urged as anticipatory. The case shows that nothing in the flat-plating art furnished any guide, precedent, or suggestion as to how cylindrical plating could be accomplished, or how seamless cylindrical compound ingots could be made. The artisans who were thoroughly acquainted with the state of the art at that time were interested to have seamless plated wire, but they were unable to produce such wire by means of anything derived from the flat-plating art. Even if a sheet of solder were used in the flat-plating art, the method of assembling the base metal, the sheet of solder, and the precious metal was merely by laying one upon the other and clamping them tightly together. This method furnished no helpful suggestion for the art of cylindrical plating. The problems presented in the two arts were entirely dissimilar. We cannot find that there is anything in the prior art which can be successfully taken as anticipatory of the patent in suit, or which can render it invalid.

Does the defendant infringe this patent? The defendant says he makes his ingot in the following way: A hollow, seamless gold tube is cast and swaged on a mandril; into this gold tube is inserted a sheet of compound solder. Then a base metal tube is placed inside the solder, within the gold tube, as a running or sliding fit, the parts having been previously fluxed. A plug is then drawn longitudinally through the inner or base metal tube, expanding the latter, and pressing the soldered sheet tightly against the gold or outer tube, the object of this expansion being to prevent blisters. The compound tube is then heated to fuse the intermediate solder, and finally reduced on a mandril to its proper size and thickness. This

completes the compound gold-plating shell. It will be seen that the defendant's method of assembling the parts is substantially the third method described in the specification of the patent in suit. The sheet of solder is placed inside the tube, and then the base metal is forced inside the solder. The defendant claims, as a matter of patent law, that the complainant must be held to the method of assembling the parts described in the claims of the patent. He insists that the patent describes three processes and three inventions, but that the claim uses only one of the processes and one invention, and hence that the other two processes are abandoned, and that the defendant has the right to use every one of those abandoned processes. We do not think so. The patent is a process patent, which is sufficiently defined to be a mode of treatment of materials to produce a given result. The thought of the inventor is to make an ingot by assembling the three parts—the core, the seamless shell, and the solder. The gist of the invention consists in using a sleeve of solder as one of the parts to be brought together, and in bringing the three parts into the proper relative position. Although the claim describes the method of bringing the three parts together by placing the core within the seamless shell and then forcibly putting the sleeve of solder into the annular space between the shell and the core, it does not show any intention of abandoning the other ways described in his specification of bringing the three parts together. The other two ways mentioned in the specification are clearly equivalents of the way mentioned in the claim. The three ways of bringing the parts together are not three inventions; if they could be held to be three distinct inventions, then the law with reference to abandonment might be properly urged; but they are three ways of accomplishing the purpose described in his process.

In the case of Reece Buttonhole Mach. Co. v. The Globe Company, 61 Fed. 958, 10 C. C. A. 194, Judge Putnam has with great clearness stated the doctrine of equivalents. The patent in the Reece Case was for a buttonhole sewing machine. In such a machine there must be a relative movement between the bedplate or work support and the stitching mechanism, in order that the stitching mechanism may follow the contour of the buttonhole. The claims of the patent were for a machine in which the stitching mechanism traveled with relation to the work support. The patent did not describe any other form of machine. In the defendant's machine the work support was made to travel with relation to the stitching mechanism. It was contended that the claims were limited in terms to a machine in which the stitching mechanism traveled, and that therefore the defendant's machine did not infringe. Judge Putnam decided in the Court of Appeals that the defendant's construction was the equivalent for that claimed in the patent, and that it therefore infringed it, under the doctrine of equivalents. In the Reece Case no other form of machine was shown, except a machine in which the stitching mechanism traveled with relation to the work support. But the court said that, though no other form of machine was mentioned, a form of machine in which the work support was made to travel with relation to the stitching mechanism was clearly an equivalent of the

construction described in the Reece patent. In a very recent case, Electric Smelting & Aluminum Company v. Pittsburg Reduction Company (C. C. A.) 125 Fed. 937, Judge Coxe says:

"Various other limitations upon the claims are urged by which the defendant seeks to avoid infringing. They are of the same general nature, and proceed upon the same initial fallacy, namely, that in a generic process patent every phenomenal observation during operation and every minute detail described must be read into the claims, and that the least departure from the claims as so construed avoids infringement. Neither position is tenable. In a patent like Bradley's the claims should be as broad as the invention, and, even if unnecessary and unreasonable limitations are incorporated in the claims, the court should interpret them liberally, and not permit the defendant to escape who reaches the same result by analogous means, though he may employ additional elements and improved mechanical appliances."

In Boston & R. Electric St. Ry. Co. v. Bemis Car Box Company, 80 Fed. 287, 25 C. C. A. 420, Judge Putnam has applied the principles of the Reece Case to a case involving a much more limited field for the doctrine of equivalents.

In Lepper v. Randall, 113 Fed. 629, 51 C. C. A. 338, the court, Judge Dallas, held that it was not necessary to decide whether the patent were a primary one, and said:

"For in no case is a patentee to be denied protection commensurate with the scope of his actual and distinctly described invention by wholly excluding him from the benefit of the doctrine of equivalents. That doctrine, therefore, should have been applied in this case, for it is plainly obvious that the departures made by the defendant from the patent in suit are merely formal, and of such character as to suggest that they were studied evasions of those described in the claim in issue."

In Bundy Company v. Detroit Time-Register Company, 94 Fed. 540, 36 C. C. A. 391, Judge Lurton, for the Court of Appeals, said:

"To be entitled to the benefit of the doctrine of equivalents, it is not essential that a patent shall be for a pioneer invention in the broad sense of that term. If his invention is one which marked a decided step in the art, and has proven of value to the public, he will be entitled to the benefit of the rule of equivalents, though not in so liberal a degree as if his invention was of a primary character."

The case at bar does not present so wide a field for the doctrine of equivalents as the Reece Case. The patent in suit, while within its scope presenting a primary invention, is not in so broad a field as the great patent involved in the Reece Case, but it clearly presents a field wherein the doctrine of equivalents may be fairly and fully invoked. In this patent the claim describes one way of assembling the parts, namely, by placing the core within the shell, forming an annular space between them, and then inserting the sleeve of solder into the annular space; but in the specification two other ways are mentioned for assembling the parts. It must be held that the two other ways mentioned in the specification are mere variances in the mode of using a single method or process, as was held in Mowry v. Whitney, 14 Wall. 620, 20 L. Ed. 860. In the Reece Case a form of machine not mentioned in the specification was held to be an equivalent, but in the patent in suit the patentee should not be prevented from claiming an equivalent by the fact that he has mentioned it in the specification. He must be held not to have described

any other invention, but merely a variance in the use of the one process invention which he has described in his claim. It is not a case where the doctrine of abandonment can be successfully invoked. The question of whether a patentee has abandoned any part of what he has described in his patent is a question very largely of intention. Robinson on Patents, §§ 352, 353. There is nothing in the specification in the case at bar to indicate an intention on the part of the inventor to surrender to the public any part or element of his invention. Where an inventor has framed his claim to include some immaterial elements in his patent, and has not made a claim as broad as his real invention, he cannot hold as an infringement a process which omits such step without substituting an equivalent therefor; but the case at bar does not present an instance of this kind. If the patentee had described an invention in his specification, and then had not referred to it in his claim, he might be held to have abandoned it. But Burdon described three ways of performing one of the steps of his method, and these three ways, under the doctrine which we have invoked, are clearly equivalents one for the other. The defendant has used one of these ways; he has thus used an equivalent way in place of the way referred to in the claim. In Tilghman v. Proctor, 102 U. S. 730, 26 L. Ed. 279, the doctrine of equivalents is applied to a process patent. In that case the court say:

"The patentee showed one method in which the heat could be applied; that was all that was necessary for him to do. If it could be applied in any number of different methods, it would not affect the validity of that patent as a patent for a process."

The case at bar presents a distinct process patent. The different ways of bringing the three parts together are ways which work substantially to accomplish the same result; the variances are merely in matters of form, and do not belong to the substance of the process. It will be seen that the defendant performed the cylindrical plating process twice; he first soldered the seamless gold shell to a tube of base metal, thereby forming a gold-plated seamless shell; he then soldered the seamless gold-plated shell to the solid cylindrical core of base metal. The defendant urges that a tube of base metal is not a metal core, within the meaning of the claim of the patent in suit; but it appears to have been manipulated for the purposes of the core in the process; and the use of it in the way it is used by the defendant must be held to be an infringement, just as much as the other use which he makes of the core of base metal. It is suggested with much force that, so far from not having infringed at all, he has in his process infringed twice. It cannot be that the use of a "hollow brass core" is any different in principle from the use of a solid base metal core. It must be held in the case at bar, as in Mowry v. Whitney, supra, that the processes of the defendant and the complainant are substantially the same in principle, mode of operation, and in the effect produced.

The defendant further urges that the only utility in the patent in suit is in the chamber described in the second claim. We cannot come to this conclusion. The use of this chamber is clearly supplementary to

the use of the sleeve of solder as described in both claims. The use of the chamber alone had been found in the patentee's earlier patents to have been insufficient to reach the object which he was attempting to reach, namely, the uniform distribution of solder. He uses the sleeve of solder for this purpose, and uses the chamber as supplementary to this purpose.

As to the utility of the whole patent, the case shows that this is the first patent in the art which has achieved practical success and been put into extensive use; that other attempts had resulted in failure. In Tannage Company v. Donallan (C. C.) 93 Fed. 812, Judge Colt says:

"As a practical and commercial method * * * it has proved very successful, and may be said to have revolutionized this branch of the tanning art. * * * In the construction of a patent of this character and in harmony with what we believe to be the principle and purpose of the patent laws of the United States, the court is naturally inclined to sustain it, unless it clearly appears to be invalid under the law."

We refer to a case very recently decided—Union Biscuit Company v. Peters (C. C. A.) 125 Fed. 601. This case, just decided in the Eighth Circuit, puts with clearness the familiar principle of law that the utility of a device cannot prove that it is a patentable invention, but that it is of course entitled to weight when that question is doubtful. The court says:

"If a doubt arise, in the construction of a patented article or device, whether the inventive faculty has been exercised, the fact that the article in question has gone into general use, that there is a demand for it, and that it seems to possess great utility, is entitled to great weight."

In the case at bar, some weight should be given to the fact that this invention has proved to be of great utility; that the invention has achieved practical success and gone into general use. Applying the principles which we have discussed, we conclude that the patent must be held to be valid, and that it is shown to have been infringed by the defendant.

We now come to the examination of the second patent in suit, the Meyer patent, No. 445,814. This Meyer patent is claimed to be an improvement upon the Burdon patent in suit. For the purpose of properly uniting two pieces of metal with a thin film of solder extending evenly and uniformly over the adjacent surfaces of the pieces to be united, the parts must be brought into close relation, and the air must be excluded as thoroughly as possible, in order to prevent blisters or bubbles and other imperfections. The purpose of the Meyer patent is to provide a close fit between the parts. In the old flat-plating art this could be done by clamping the parts together; the problem was an entirely different one in the art of cylindrical plating. Meyer invented an effective way of tightening the parts in the cylindrical ingot by subjecting the ingot to the action of a draw-plate, or of rollers, prior to subjecting the ingot to heat to fuse the solder. This patent in suit is for a method involving the employment of this additional step in connection with the method of the Burdon patent. He says in his specification:

"In forming ingots for seamless plated wire a seamless tube or shell of precious metal, or a shell formed of inferior metal plated on the outside with

precious metal, is secured to the core by solder interposed between the core and the seamless tube or shell, and the tube or shell is united to the core by fusing the solder in a furnace. As the so-formed ingots have to be drawn or rolled out lengthwise into wire or plates, it is important to use as little solder in the ingot as possible, and also to interpose the solder uniformly of even thickness between the core and the shell.

"The object of my invention is to secure these results by the cheap and certain step in the process of firmly drawing or rolling the shell on to the solder-covered core, metal to metal, so that when the solder is fused the liquid solder cannot flow from one part of the ingot to another, and thus produce unequal distribution of the solder."

He states, further, that he forms around the core a sheet of solder, thereby forming the sleeve of solder of the Burdon patent; that, after this solder-covered core has been inserted into the seamless shell, he then draws said shell down firmly upon the solder by passing the combined core, solder, and shell through one or more holes in a draw-plate or between suitable rollers; and that, after the tube has been drawn down close to the core, he then subjects the so-prepared ingot to heat to melt the solder, and thus firmly secures every part of the interior surface of the shell to the core. His claim is as follows:

"The herein-described process of making ingots for seamless wire, the same consisting in bending and drawing around the prepared core a sheet of solder, inserting the solder-covered core into a prepared tube of plating metal, forcing the plating tube into close contact with the solder-covered core by contracting the diameter of the tube, and then subjecting the so-formed ingot to heat to melt the solder to unite the tube to the core, as described."

It must be seen that the patentee was dealing primarily with an ingot having a solid core, and that he found it convenient to use means which would force the shell "down on to the core," and that he thus reduced or contracted the diameter of the shell. The gist of his invention appears to have been in the words of the claim, "forcing the plating tube into close contact with the solder-covered core." But the defendant says he does not infringe this patent, because in effecting this result he is dealing with a hollow core, and he adopts the plan of drawing a tapering plug through the inside of the hollow brass core or base metal tube, which enlarges the hole in the base metal tube, causing the same to press the solder very closely against the hollow tube, also enlarging it. The object, as his testimony shows, is the same as is the object of Meyer, namely, "to bring all the parts as closely together as possible." Where he does not use the hollow core, he uses a base metal solid core of larger diameter, and thus expands the shell. The means employed by the defendant are thus plainly a reversal of the process of Meyer. The defendant's position is that the claim refers to "bending and drawing around the prepared core a sheet of solder," and to "inserting the solder-covered core into a prepared tube of plating metal." The defendant urges that the claim is limited to that particular way of assembling the three parts composing the ingot; that the defendant does not employ that particular way of assembling the parts, but that he assembles them by first inserting the sleeve of solder into a seamless shell of plating metal, and then inserts the core into the solder-lined shell. He further insists that the Meyer claim does not cover a process for forcing the plating members into contact by a relative change in the diameter of the parts, but is limited to a contact at-

tained by forcing the plating tube upon the core "by contracting the diameter of the tube." The thought of the inventor in the Meyer patent, the characteristic step of that patent, is "forcing the plating tube into close contact with the solder-covered core." The Reece Case and other cases which we have discussed upon the question of equivalents are decisive of the principles of this case. We refer also to the case of United States Peg Wood S. & L. B. Company v. Sturtevant Company (C. C. A.) 125 Fed. 382, in which this court, in referring to the Reece Case, alludes to the fact that the defendant, by reversing a described arrangement, cannot evade the spirit of the specification and claims. In Dowagiac Mfg. Company v. Minnesota Moline Company, 118 Fed. 141, 55 C. C. A. 91, the court said:

"By changing the form of complainant's combination, and not essentially varying the principle or mode of operation pervading the original invention, defendants cannot escape infringement."

In the case at bar, the method which the defendant has used presents an equivalent of the method of the patent in suit, although it shows a reversal of one of its processes.

The defendant says, further, that the Meyer patent has been anticipated. He cites first the Smith patent, No. 427,924. The method of this Smith patent involves the use of a tapered shell and a tapered core, resulting in the production of a tapered ingot. The purpose of the Meyer patent is, as we have described, to force the plating tube into close contact with the solder-covered core. The purpose of the Smith patent was, by the shape of his core and shell, to squeeze out the surplus solder during the fusing operation. The purpose of the Smith patent being different from the purpose of the Meyer patent, we cannot hold that the Smith patent anticipates the Meyer patent. The Meyer patent of 1890 is urged also as an anticipation. This patent does not relate to a method of making seamless plated wire or ingots, but to a method of making seamed plated wire and seamed ingots; it is in the flat-plating art, and has no relation to the art of cylindrical plating. We have already held, in discussing the Burdon patent, that the art of cylindrical plating is a different art from that of flat plating. The problem presented to the mind of the inventor of bringing the three parts together in flat plating is a distinctly different problem from that relating to bringing these parts together in cylindrical plating. There is no disclosure in the flat-plating art of the method of this Meyer patent which involves the employment of an outer seamless shell, an inner cylindrical core, with interposed solder, and the forcing of these parts in a close contact, as the result of which operation the parts will remain in close contact during the fusing. We must hold that the Meyer patent in suit is valid, and that it has been infringed by the defendant.

The decree in respect to both patents in suit must be for an injunction and for an accounting.